UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JASON MOORE, | CASE NO. 3:23-cv-05210-DGE |
| Plaintiff, | |
| v. | ORDER GRANTING SUMMARY JUDGMENT (DKT. NO. 28) |
| EFFECTUAL INC., | |
| Defendant. | |

## I    INTRODUCTION

This matter comes before the Court on Defendant's Motion for Summary Judgment. (Dkt. No. 28.)  Upon review of that motion, the Plaintiff's response (Dkt. No. 31), and Defendant's reply (Dkt. No. 34), the Court **GRANTS** the motion.[1]

---

[1] Pursuant to Local Rule 7(b)(4), the Court finds a decision can be made on the motion without oral argument.

## II      BACKGROUND

This is an employment dispute between Plaintiff Jason Moore and Defendant Effectual, Inc. ("Effectual"). Effectual works with commercial enterprises and the public sector to modernize IT and optimize cloud environments to improve performance and cost efficiency. (Dkt. No. 29-1 at 2.)

The complaint alleges Moore was terminated because of his religious beliefs. On August 27, 2021, Moore signed an Offer of Employment letter and began employment at Effectual on October 4, 2021. (Dkt. No. 1-1 at 3.) On October 5, 2021, Rick Ruskin, Chief Sales Officer of Effectual, conducted an "all-hands" phone conference in which he informed Moore for the first time that Effectual intended to implement a Covid-19 Vaccination Policy. (*Id.*) On October 8, 2021, Effectual implemented the vaccination policy, expressly requiring employees be fully vaccinated against Covid-19 by November 30, 2021, or otherwise request an accommodation. (*Id.*) Moore submitted a request for religious exemption on October 14. (*Id.*) Effectual allegedly "refused to consider Plaintiff Moore's request for a religious exemption and on October 14, 2021, [Effectual] terminated Plaintiff Moore's employment[.]" (*Id.* at 4.) Moore claims Effectual violated discrimination statutes in Washington, where Moore lived, and New Jersey, the state of Effectual's principal place of business. (*Id.*)

The parties provide sharply different accounts of these events. According to Effectual, Moore was hired because Ruskin began recruiting for an Enterprise Account Executive ("EAE") to support Effectual's growing West Coast Sales Organization. (Dkt. No. 29-1 at 3.) EAEs work mostly in the field at client sites and in customer-facing industry events, conferences, and meetings, requiring strong interpersonal and customer service skills in all internal and external communications. (*Id.*) When the pandemic hit, EAE conferences and events were canceled.

1  (*Id.*)  By Fall 2021, and in part because of the mass roll-out of the Covid-19 vaccines, the sales

2  organization and many customers, partners, and vendors began transitioning back to in-person

3  events.

4         Moore was recommended to Ruskin by current employees at Effectual.  (Dkt. No. 29-2 at

5  5–6.)  Effectual offered Moore a position, but Moore requested additional time to close various

6  deals at his prior employer, resulting in a start date of October 4, 2021.  (*Id.*  at 7–8.)  During

7  Moore's employment, Ruskin was his direct and only supervisor.  (Dkt. No. 29-1 at 3.)

8         On October 5, 2021, during Moore's first weekly sales team meeting, Ruskin announced

9  Effectual would likely publish its written Covid-19 vaccination policy by the end of the week,

10 requiring all customer-facing employees to become vaccinated or request an accommodation by

11 the end of November.  (*Id.* at 3–4.)  Regardless of whether EAEs reported to a physical office,

12 their duties were "customer facing," meaning the vaccination policy required Moore to be

13 vaccinated or to receive an accommodation by November 30th.  (*Id.*)

14        In addition to the policy, everyone in Effectual's sales organization was required to

15 become vaccinated to attend a client conference in Las Vegas called "re:Invent."  (Dkt. Nos. 29-

16 1 at 4; 29-2 at 9–10.)  Effectual planned on spending thousands of dollars for hotel rooms and

17 plane tickets for the sales team to attend the event, which involved two of Effectual's partners—

18 Amazon Web Services ("AWS") and Trace3—who, together, comprise a large percentage of

19 Effectual's revenue.  (Dkt. No. 29-2 at 9–10.)  AWS initiated a vaccine mandate for all those

20 attending the event, which was to occur shortly after Thanksgiving.  (*Id.*)

21        On October 6, 2021, Ruskin reached out to Moore, who had just started working at

22 Effectual, to ask if he was vaccinated.  (*Id.*)  Ruskin explained he was adding Moore to the list of

23 employees to attend re:Invent, and that vaccination was mandatory for attendance.  (Dkt. No. 32-

24

1   6 at 1.)  Ruskin asked, "is it something you are planning to do?" to which Moore responded, "In

2   full transparency, No."  (*Id.*)  Ruskin responded: "Oh Shit…"  (Dkt. No. 32-6 at 1.)   In those

3   messages, Moore did not state anything his reasons for not getting vaccinated or any conflict

4   between his religion and the vaccination policy.  (Dkt. Nos. 29-1 at 4, 32-6 at 1.)

5         On October 8, 2021, Effectual published its Covid-19 vaccination policy.  (Dkt. No. 29-4

6   at 11–18.)  The policy stated:

7         **By no later than November 30, 2021** (or, as to newly hired employees, within 45
          days of hire), employees must either:

8
9              1.  Become fully vaccinated against COVID-19 by obtaining all required doses
                   of an approved COVID-19 vaccination and provide proof of vaccination to
10                 Effectual Human Resources as described below; or

11             2.  Request an accommodation from the COVID-19 vaccination requirement
                   as described below . . . .

12        Employees who are unable to be vaccinated and/or comply with applicable
          COVID-19 safety protocols due to a disability, pregnancy, a qualifying medical
13        condition that contraindicates vaccination or objections due to sincerely held
          religious beliefs, practices, or observances may request an accommodation or
14        exemption . . . . To request an accommodation for one of the above reasons, an
          employee must complete a Medical Accommodation Request Form or a Religious
15        Accommodation Request Form (available from Human Resources).

16  (*Id.* at 15, 17.)  The policy contained language explaining the accommodation requests would be

17  confidential and noting its non-discrimination and non-retaliation policy.  (*Id.* at 17–18.)

18        Ruskin sent an email on October 11, 2021 to the entire sales team requesting any

19  unvaccinated employees schedule a time with Ruskin to discuss their situation, stating, "as we

20  know these decisions are quite personal."  (Dkt. No. 29-1 at 9.)  Moore did not contact Ruskin or

21  schedule a time to meet.  (*Id.* at 4.)  Ruskin sent a Zoom video call meeting invitation to Moore

22  for October 12, 2021 with the subject line "Rick Ruskin's Zoom Meeting." (*Id.* at 13.)

23

24

ORDER GRANTING SUMMARY JUDGMENT (DKT. NO. 28) - 4

1    According to Ruskin, the conversation on October 12 "went downhill quickly."  (Dkt.

2    No. 29-2 at 22.)  Moore informed Ruskin "he wasn't going to be vaccinated[,]" and made "a

3    bunch of antiscience type of comments; that it wasn't real.  It wasn't a real vaccine. It wasn't

4    going to work." (*Id.*)  Moore told Ruskin the vaccine was a product of "fucking Fauci"[2] and told

5    Ruskin, "This is fucking bullshit. What you guys are doing is fucking bullshit."  (Dkt. No. 29-2

6    at 23.)  Moore told Ruskin he was a "crazy liberal."  (*Id.* at 16.)  Moore was angry that neither

7    Ruskin nor anyone else at Effectual had communicated the policy to him prior to the date of the

8    policy's roll-out.  (Dkt. No. 29-4 at 4.)

9    Ruskin later stated: "Mr. Moore's conduct on the October 12, 2021 Zoom call was

10    unacceptable to me.  I lost trust in Mr. Moore's ability to handle difficult conversations with his

11    internal and external customers.  In fact, I believed I could never put him in front of Effectual's

12    customers."  (Dkt. No. 29-1 at 5.)  Ruskin decided to terminate Moore's employment with

13    Effectual "because of his insubordinate and disrespectful conduct" during the meeting.  (*Id.*)

14    Ruskin communicated his concerns and decision to Alexis Breslin, Chief Human Resources

15    Officer, and Robb Allen, Effectual's CEO.  (*Id.*)  Both Breslin and Allen agreed with Ruskin's

16    decision to terminate Moore.  (*Id.*)  Moore and Ruskin had no interaction between the October 12

17    meeting and Moore's termination on October 14, 2021.  (*Id.*)

18    According to Breslin, who sat in on the termination meeting as a witness, Moore never

19    mentioned religion as the basis for his decision not to be vaccinated until after Ruskin told

20    Moore Effectual had terminated his employment.  (Dkt. No. 29-4 at 4.)  Breslin recalls Moore

21    brought up religion in the context of asking a hypothetical "religious or medical

22

23    [2] Referencing Anthony Fauci, who was Director of the National Institute of Allergy and
     Infectious Diseases and member of the White House Coronavirus Task Force in 2020 during the
24    initial height of the pandemic.

1    accommodation" generally.  (*Id.*)  According to Breslin, "Effectual would have considered a

2    request for a religious accommodation if he had submitted one as an employee, but because his

3    employment was already terminated, I had no occasion to do so."  (*Id.* at 4–5.)  "I told him—and

4    this was after his termination, when he then started to mention a religious accommodation.  I told

5    him that had he submitted as an employee, we would have taken it through the correct

6    processes . . . ."  (Dkt. No. 35-1 at 5.)  "I never denied him a right to a religious

7    accommodation . . . . as an employee, he never requested such."  (*Id.* at 6.)

8            Ruskin remembers four or five other employees who were not yet vaccinated at the time

9    he discussed vaccination with Moore.  (Dkt. No. 29-2 at 20.)  One employee requested a

10   religious exemption, and Effectual determined the employee would never be customer facing,

11   "so [Effectual] had no issue with her request for a religious exemption."  (*Id.*)  Another

12   employee, who did not formally apply for the exemption as per the policy, told Ruskin he would

13   miss the deadline because he was not approved to get the vaccine for medical reasons.  (*Id.* at

14   21.)  Ruskin told him not to worry about the deadline, and eventually the employee was cleared

15   by his doctor and was vaccinated.  (*Id.*)  According to Ruskin, two other employees "basically

16   called me up that afternoon and said, I've got an appointment to get my vaccine Friday.  I don't

17   like it.  I don't agree with it.  I'm getting vaccinated on Friday.  That's how those conversations

18   went."  (*Id.*)

19           In Effectual's employee records, the official reason Moore was terminated was "Failure

20   to comply with Company policy[.]"  (Dkt. No. 32-13 at 1.)  Breslin identified the policy as "our

21   code of conduct policy[,]" explaining Moore violated it by "using profanity, carrying on.  He was

22   absolutely insubordinate to his manager and completely unprofessional as someone who is to

23   represent this company."  (Dkt. No. 29-5 at 9.)  In his deposition, Ruskin explained further:

24

ORDER GRANTING SUMMARY JUDGMENT (DKT. NO. 28) - 6

**Mr. Reich**: Is [failure to comply with company policy] the reason Jason Moore was terminated?

**Mr. Ruskin**: Yeah.  Company policy is you can't curse at your manager. You can't, you know, get aggressive and threaten him.  That's why he was fired.

**Mr. Reich:** Oh, it had nothing to do with the COVID vaccine?

**Mr. Ruskin:** Zero. Parker, I just told you he was one of five or six people who wasn't vaccinated. The other ones came to me and said, I'm getting it this Friday, or, I would like to request a religious exemption; here's why. Or, I have a medical —I have dealt with all these things. He was just like that other group of people except they professionally came to me and told me what their issue was. We worked with all of them, and they all ended up staying with the company. We worked through all of their issues. He's the only one who basically said, This is fucking bullshit. You know, you know, it was— it was a rant. It was crazy. This had nothing to do with the vaccine policy. He was one of many who, at that point, were not adherent to it.

(Dkt. No. 29-2 at 14–15.)

Plaintiff remembers the events differently.  According to Moore:

During the October 12, 2021 Zoom meeting with Rick Ruskin, I did NOT say Effectual's policy was "fucking bullshit;" I did NOT say "fucking Fauci;" and I did NOT tell my new boss (Rick Ruskin) the he was a "crazy liberal." On that October 12, 2021 call, Rick Ruskin asked me directly why I was against taking the Covid Vaccine, and I told him I held religious and political beliefs around it.

(Dkt. No. 32-9 at 2.)  While Moore recalls saying "B.S., and literally using the initials B.S.[,]" he does not recall cursing during the conversation.  (Dkt. No. 29-3 at 53.)  Moore remembers Ruskin asking if he intended to get vaccinated, to which Moore said no. (*Id.* at 50.)  Ruskin "proceeded to ask [Moore], he said, You mind me asking just your stance on why you're not going to—you know, why are you not taking it?"  (*Id.*)  Moore "responded with [his] personal feelings and responses to him why [Moore] wasn't going to take it at that time[,]" prompting Ruskin to "kind of go into some anecdotal stories" about friends and relatives dying of COVID, working in healthcare, and seeing unvaccinated people requiring hospitalization.  (*Id.* at 50–51.)  Ruskin emphasized there were partners and customers Effectual wanted to continue to do

1   business which required vaccinated sales force. (*Id.* at 51.) Moore pointed out that he did not

2   have any customers yet, and if vaccination was required to join the sales team, it "would have

3   been nice to know" before his last day with his previous employer, to which Ruskin replied,

4   "Yeah, we really screwed up on that, we should have reached out to you." (*Id.* at 52–53.)

5         Because the policy allowed Moore, as a new employee, 45 days from the date of his hire

6   to become vaccinated, he believed he had until that time to either decide to get vaccinated or

7   request a religious accommodation. (Dkt. No. 32-9 at 2.) When Moore received the invitation

8   from Ruskin for the October 14th Zoom meeting, he believed the call was to discuss his ability to

9   submit an exemption request. (*Id.*) Moore believed this because an HR representative would be

10  in attendance (Breslin) and because Ruskin titled the meeting "Discuss Vaccine policy Status[.]"

11  (Dkt. Nos. 29-1 at 15, 32-9 at 2.) According to Ruskin, he "did not know what to identify as the

12  subject of the meeting without tipping Mr. Moore off that it was a termination meeting, so

13  [Ruskin] called it the last topic about which we had spoken." (Dkt. No. 29-1 at 5.)

14        At the October 14th termination, Moore remembers Ruskin asking if Moore had "given it

15  any other thought or have you changed your mind at all about becoming vaccinated?" (Dkt. No.

16  32-9 at 3.) Moore said he had not changed his position. (*Id.*) According to Moore, Ruskin went

17  on to discuss the re:Invent conference and the importance of vaccination for face-to-face with

18  customers. (*Id.*) Ruskin noted if Moore was not going to get vaccinated, then Effectual did not

19  want to continue Moore's on-boarding since he was not going to adhere to the Covid-19 policy.

20  (*Id.*) Moore explained he did not know a condition of his employment was to attend

21  conferences, and mentioned he did not personally care if he went to the re:Invent conference.

22  (*Id.*) Moore noted he still had time to put in for a religious or medical exemption, that he had his

23  religious exemption ready to go, and that he would like to request to put it in, at which point

24

1   Breslin spoke up and said there was no need for the submission.  (*Id.*)  Moore quotes Breslin

2   stating: "Your only condition of employment to stay with Effectual is to be fully vaccinated

3   against the COVID-19 virus or to be fully vaccinated and showing proof."  (*Id.*)  Moore said he

4   would not take the vaccine, and Breslin told Moore he would be terminated.  (*Id.*)

5        Moore's wife, Sarah, was present in the room during the termination call.  (Dkt. No. 32-

6   12 at 1.)  Sarah recalls Ruskin asking if Moore had changed his mind about the vaccine, to which

7   Moore replied he would not take the vaccine.  (*Id.* at 2.)  Moore asked to submit his religious

8   exemption, and Breslin responded it would not be necessary to file one as it would be "denied on

9   the spot."  (*Id.*)  Sarah "did not witness any discussion about unprofessional behavior on the part

10  of [Moore] at any point in the October 14, 2021 meeting.  All the parties on the call were

11  professional; there was not any swearing by either side.  It was short and to the point."  (*Id.*)

12       Moore immediately lacked access to his Effectual systems.  (*Id.* at 4.)  Within five

13  minutes of the termination meeting ending, Moore outlined what happened on the call in a

14  document (Dkt. No. 32-4 at 1–2) and submitted the religious exemption to Ruskin from his

15  personal e-mail account, stating: "As I just heard both of you (yourself and Alexis Breslin) state

16  on our joint call, Effectual will reject this Religious exemption request before I have even the

17  opportunity to send it over for review" (Dkt. No. 32-9 at 9–10).  "Per Alexis, the condition of my

18  employment at Effectual has only one path, which is to be fully vaccinated for COVID-19."  (*Id.*

19  at 10.)  Ruskin forwarded the email to Breslin, commenting "Oh my…".  (Dkt. No. 32-2 at 3.)

20  Breslin responded: "I never denied his right to request a religious accommodation.  I clearly

21  stated that given the position he is currently in, an accommodation being made is not likely, as a

22  sales person must travel and meet with customers."  (*Id.* at 2.)  Ruskin replied: "I agree.  His only

23  skill is selling and that is a customer facing job."  (*Id.*)

24

Moore states neither Breslin nor Ruskin commented on any poor conduct or behavior, profanity, calling Ruskin any names, or any of the other allegations.  (Dkt. No. 32-9 at 4.) According to Moore, "it wasn't until this case started that Rick Ruskin made false claims about my conduct towards him."  (*Id.*)  Breslin sent a notification on October 18th with an agreement of separation document, which Moore never signed.  (*Id.*)

On October 21, 2021, Moore sent the document he wrote outlining what happened in the call to Effectual, to which Effectual did not respond.  (Dkt. Nos. 31 at 8, 32-4 at 1–2.)  Breslin admitted during her deposition that there is no "written document, e-mail, Slack, text message, memo" or any other record in Effectual's database that would 'corroborate any code of conduct violation."  (Dkt. No. 32-10 at 2.)  Similarly, Ruskin testified there was no written record discussing or summarizing what happened in the October 12, 2021 meeting between Ruskin and Moore.  (Dkt. No. 32-11 at 2.)

Effectual filed a motion for summary judgment, arguing Moore lacks standing under New Jersey's law against discrimination ("NJLAD") and because he cannot establish his failure to accommodate claim under both the NJLAD and Washington Law Against Discrimination ("WLAD") nor a breach of his at-will employment agreement.  (Dkt. No. 28.)

### III     DISCUSSION

#### A.  Legal Standard

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the

1   burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

2   of fact where the record, taken as a whole, could not lead a rational trier of fact to find for the

3   nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)

4   (stating that the nonmoving party must present specific, significant probative evidence, not

5   simply "some metaphysical doubt.").  Conversely, a genuine dispute over a material fact exists if

6   there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to

7   resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253

8   (1986); *T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.

9   1987).

10          The determination of the existence of a material fact is often a close question.  The court

11   must consider the substantive evidentiary burden that the nonmoving party must meet at trial—

12   e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, *T.W. Elec.*

13   *Serv.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor of the

14   nonmoving party only when the facts specifically attested by that party contradict facts

15   specifically attested by the moving party.  The nonmoving party may not merely state that it will

16   discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

17   to support the claim.  *T.W. Elec. Serv.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 256–

18   257).  Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts"

19   will not be "presumed."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–889 (1990).

20      **B.  Standing**

21          Effectual argues Moore's NJLAD claim fails because he lacks standing as a Washington

22   resident.  (Dkt. No. 28 at 11.)  Effectual admits it is headquartered in New Jersey, but argues

23   Moore is a Washington State employee with no known contacts in New Jersey.   (Dkt. No. 28.)

24

Moore cites *Calabotta v. Phibro Animal Health Corporation*, noting the NJLAD applies to non-residents of New Jersey.  (Dkt. No. 31 at 10); 213 A.3d 210, 224 (N.J. Ct. App. Div. 2019).  *Calabotta* found "no expression of legislative intent to limit the statute's protections to job applicants who live in New Jersey, or to those employees who perform all of their employment functions in New Jersey."  *Calabotta*, 213 A.3d at 224.  Defendants do not mention this issue in their reply.  (Dkt. No. 34.)  The Court finds Moore may properly bring a claim under NJLAD because Effectual maintains its principal place of business in New Jersey.[3]

**C. Merits**

Defendant argues Plaintiff cannot establish his failure to accommodate claims under the NJLAD or WLAD.  (Dkt. No. 28 at 12–17.)  Effectual also challenges Moore's theory of wrongful discharge in violation of public policy and that Effectual's conduct amounted to a breach of contract.  (*Id.* at 17–24.)

1. <u>Failure to accommodate claims</u>

A plaintiff establishes a *prima facie* claim of failure to accommodate religious practices under WLAD by showing that (1) he or she had a bona fide religious belief, the practice of which conflicted with employment duties; (2) he or she informed the employer of the beliefs and the conflict; and (3) the employer responded by subjecting the employee to threatened or actual discriminatory treatment.  *Kumar v. Gate Gourmet Inc.*, 325 P.3d 193, 203 (Wash. 2014).

---

[3] "A corporation shall be deemed to be a citizen of any State by which it has been incorporated and the State where it has its principal place of business."  28 U.S.C. § 1332(c)(1).  "Principal place of business" is "the place where a corporation's officers direct, control, and coordinate the corporation's  activities."  *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010).  "In practice it should normally be the place where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination, *i.e.,* the "nerve center," and not simply an office where the corporation holds its board meetings[.]" *Id.* at 93.  Effectual is headquartered in New Jersey, and is therefore a citizen of New Jersey and subject to the NJLAD.

Similarly, under NJLAD, to establish a *prima facie* case of religious discrimination for failure to accommodate, the employee must allege: (1) he holds a sincere religious belief that conflicts with a job requirement; (2) he informed his employer of the conflict; and (3) he was disciplined for failing to comply with the conflicting requirement. *Aliano v. Twp. of Maplewood*, No. 22-cv-5598 (ES) (AME), 2023 WL 4398493, at *3 (D.N.J. July 7, 2023) (citing *Webb v. City of Philadelphia*, 562 F.3d 256, 259 (3d Cir. 2009)).

Defendant argues Moore cannot establish any element of his *prima facie* claims. (Dkt. No. 28 at 12–17.)  As this Court views the evidence presented by both parties, there is clearly a genuine dispute of fact material to elements of these claims.  The parties have diametrically opposed narratives of the conversation between Ruskin and Moore at the October 12 meeting, with no written document to support either side's version of events.  Ruskin and Breslin assert they informed Moore he was terminated *before* he ever mentioned a religious request; Moore and his wife assert he asked if he could submit the religious accommodation request and was denied on the spot and terminated *after*, which is relevant to whether Effectual knew of Moore's religious objections when they fired him.  The parties certainly disagree as to why Moore was terminated: Moore asserts it was because of his religious decision not to get vaccinated, while Effectual asserts it was because of his violation of the company's code of conduct due to his behavior at the October 12th meeting.  Because of these genuine disputes, summary judgment would be inappropriate as to the second and third questions asked by WLAD and NJLAD: whether Moore informed Effectual of his religious beliefs, and whether Effectual terminated him because of the conflict between his beliefs and his employment duties.

The real issue is whether Moore's had a "bona fide religious belief, the practice of which conflicted with employment duties" under WLAD, or a "a sincere religious belief that conflicts

1   with a job requirement" under NJLAD.  If Moore's religious beliefs are not sincere, he cannot

2   sustain failure to accommodate claims under either statute.  Although there is a dispute as to

3   whether Moore's religious beliefs are sincere, the Court finds the dispute is not genuine.

4         The following is all the evidence regarding Moore's purported religious beliefs.

5   According to Plaintiff's deposition, he attended church almost every Sunday at Sunset Bible

6   Church in Gig Harbor, Washington.  (Dkt. No. 29-3 at 9.)  He testified there is no church

7   directive that parishioners should not receive vaccines.  (*Id.* at 10.)  The back-dated religious

8   exemption request Moore sent to Effectual after being terminated on October 14, 2021 read:

9        October 11, 2021

10        To Whom It May Concern within Effectual:

11

12            I submit this statement to request a religious exemption from Effectual's mandatory vaccinations, including the COVID-19 vaccine as it would violate my sincerely held personal religious beliefs. I therefore assert my right to a religious exemption in accordance with state and federal law. Pursuant to N.J.A.C. 8:57-6.4(a), I request exemption from the required COVID-19 vaccine.

13

14            As a Christian who believes in the Sovereign power of Jesus Christ as Lord over  my life, I believe that God has predetermined a perfect plan for my life and therefore I  object to the injection of all future vaccinations, including the covid-19 vaccination. To inject myself with any substance which would alter my state into which I was born would be to criticize my Lord and question His divine omnipotence. My faith will not allow me to question my Lord and God, nor challenge His divine power.

15

16

17

18            Thus, I believe that the injection of foreign matter into my body is a sacrilegious violation of my faith. Jesus makes many promises to the Faithful, including protecting me when my faith is entrusted to Him. Within the doctrine of my religious belief, I believe in the Lord God as the Almighty and Sovereign God who is in control of all. The plans and  purpose for my life are determined by the will and power of God. It is through my faith,  biblical practices and prayer that I believe in the Lord's plan above my own  understanding. I trust in the Lord's perfect plan for my life, therefore, I wish to let his  plan unravel through me.

19

20

21

22

23            This mandatory vaccination conflicts with God's law and I am bound to follow  His law. He has commanded me to treat my body as a temple, "Do you not know that  your bodies are temples of the Holy Spirit, who is in you, whom you

24

have received from God? You are not your own; you were bought at a price. Therefore honor God with your bodies" 1 Corinthians 6:19-20. I believe in the word of the Living God who says, "your  faith might not rest in the wisdom of men but in the power of God" 1 Corinthians 2:5. As  a person of faith, who believes in the Sovereignty of the Lord Jesus. "For we are his workmanship, created in Christ Jesus for good works, which God prepared beforehand, that we should walk in them" Ephesians 2:10.

Sincerely,

Jason Moore

(*Id.* at 194.)  When questioned about this letter, Moore stated he did not recall whether he wrote it by "[him]self out of whole cloth."  (*Id.* at 65.)  Moore states he contacted his friend, Anthony Bruno, who had asked for a religious accommodation at his job; Bruno sent him a letter that Moore took portions of then "made [his] own changes to it."  (*Id.* at 66–67.)  Moore maintains "the bulk" of the statement is his own writing, but upon questioning was not certain which portions of it were his and which were Bruno's.  (*Id.* at 70–71.)

The language of Moore's beliefs as outlined in the letter are in sharp contrast with the reasoning Moore testified that he originally gave Ruskin on October 12, 2021, when Ruskin asked Moore why he opposed vaccination:

Number one, I told him that it's under Federal Emergency Use Authorization Act and if I were to take it and something ever happened to me, because it's being called a vaccine, meaning I had some sort of risk about it, my family would not be —was not going to be able to hold anybody accountable, number one. Number  two, I said I don't even have medical benefits with you guys. So if I do take it and have some sort of issue, I said, I don't even have healthcare benefits. I said, number three, and what I told him was, I said, according to the studies that were out—and I did reference Bloomberg, by the way, whom he talked about, I said, according to the— according to the data, right, I'm not a high risk for anything happening to me based on my age and health conditions. So everything that points to me I have a percent chance of if I get COVID to basically be able to survive through it and the studies say that my natural antibodies are going to be X greater than that of taking the vaccine. So I would rather take my risk with that because it's better odds. And ultimately what I said about Fauci, I said, Quite honestly, Rick, as I stated it to him, I said, with all the—with all the wavering back and forth of the policies of this, no, we're going to do this, no we're going to do that, I said, I just don't trust—I don't

1    trust anybody that's delivering the message, including Fauci and everybody else. I
2    said, I don't have trust with them, and I left it at that. Those are the conversation
     topics that I said.

3    (*Id.* at 54–55.)

4         Effectual argues Moore's religious beliefs are not "bona fide" or "sincerely held" because

5    his primary reasons for refusing the vaccine had nothing to do with religion, and instead were

6    attributable to his secular beliefs about its efficacy and his distrust of "anybody that's delivering

7    the message" about COVID-related policies, including Dr. Fauci.  (Dkt. No. 28 at 14–15.)

8    Plaintiff argues Moore may have both secular and religious reasons for not getting vaccinated,

9    and the secular reasoning does not "cancel out" the protected religious objection.  (*Id.*)  This is

10   true; where a "religious belief is sincerely held, the presence of longstanding secular objections

11   does not refute the finding of sincerity any more than it negates" the connection between the

12   sincerely held religious belief and the objection. *Callahan v. Woods*, 658 F.2d 679, 684 (9th Cir.

13   1981).  But that does not obviate the need for Plaintiff to make a showing that the religious

14   reason for his objection is sincerely held.

15        Taking Moore's deposition testimony and affidavit at face value, the sincerity of his

16   religious beliefs preventing him from getting the Covid-19 vaccination is suspect.  First, there are

17   inconsistencies in his narrative as it relates to his communication of his religious beliefs.  For

18   example, Moore's affidavit states that during their conversation on October 12th, "I told

19   [Ruskin] I held religious and political beliefs around it[,]" but in his deposition, Moore states

20   about this same conversation: "We did not talk about religious exemption or accommodation on

21   the call" and instead admitted he listed only secular reasons for not wanting to get vaccinated.

22   (Dkt. No. 29-3 at 56.)  And, although it is puzzling and perhaps inappropriate that Effectual

23   continued to pressure Moore to provide them with an explanation well in advance of the

24

1    vaccination/accommodation deadline, it is even more strange that Moore responded at multiple

2    times to these inquiries (once during the Slack conversation, once during the October 12th call,

3    and once during the October 14th call, potentially prior to termination) without mentioning his

4    religious objections at all.  One would think, knowing accommodations could be made for

5    religious objectors, Moore would respond with that objection and communicate his intent to

6    submit his request for a religious accommodation.  Instead, Moore provided a number of reasons

7    why he opposed vaccination, none of them religious in nature.  And, regardless of whether

8    Effectual terminated Moore before or after he mentioned his religious accommodation request,

9    the written request is not his own; he could not remember which parts of it he wrote; he did not

10   testify to or affirm his personal religious beliefs nor explain how they conflicted with the

11   vaccine.  Other than the back-dated, co-authored letter, there is no other evidence asserting or

12   explaining Moore's religious beliefs or how sincerely he holds them.

13          It is quite clear More had scientific and political objections to the vaccine that he

14   attempted to "fit" to his religious beliefs in order to potentially qualify for a religious exemption.

15   This does not suffice to establish a *prima facie* case that Moore maintained a bona fide or

16   sincerely held religious belief.  *See, e.g., Detwiler v. Mid-Columbia Med. Ctr.*, No. 3:22-CV-

17   01306-JR, 2022 WL 19977290, at *4 (D. Or. Dec. 20, 2022), *report and recommendation*

18   *adopted*, No. 3:22-CV-01306-JR, 2023 WL 3687406 (D. Or. May 26, 2023).  In *Detwiler*, the

19   plaintiff, a practicing Christian, was exempted from her employer's Covid-19 vaccination

20   requirement, citing "the use of cells from 'aborted fetuses' in developing" the vaccines.  *Id.* at

21   *1.  As part of her accommodation, the hospital where she worked required her to wear an N95

22   mask while in the office and to submit to weekly antigen testing.  *Id.*  She then requested a

23   religious exemption from the antigen testing, explaining her objection to violating the will of

24

God by harming her body with COVID testing based on a belief that the antigen test is "dipped in ethylene oxide," a "carcinogenic substance" that is "cancer[ous]" and has "adverse effects on DNA profiles." *Id.* at \*2.  The Court affirmed the hospital's denial of this accommodation request, explaining that plaintiff's allegations centered on her belief that Covid-19 antigen tests are carcinogenic rather than any religious belief. *Id.* at \*4.  Here, the same is true. Moore testified his objections center on his belief that the Covid-19 vaccine is potentially harmful, ineffective, and recommended by politicians he distrusts rather than any religious belief.  He stated the first reason he did not want to get vaccinated was his family's inability to seek recourse should the vaccine harm him because of its status under the Federal Emergency Use Authorization Act; his second reason related to his lack of health insurance; third was his opinion that he was not a "high-risk" individual, and his belief that data demonstrated he maintained "better odds" without the vaccine; fourth was his distrust of Dr. Fauci and the "wavering back and forth of the policies."  (Dkt. No. 29-3 at 55.)  His purported religious beliefs did not make the list.

*Detwiler* noted that courts have been reluctant, in a variety of contexts, to recognize analogous beliefs as religious in nature.  2022 WL 19977290 at \*4*; see also Fallon v. Mercy Cath. Med. Ctr. of Se. Pennsylvania*, 877 F.3d 487, 492 (3d Cir. 2017) (dismissing a Title VII claim based on a religious objection to the flu vaccine that was derived from the secular/medical belief that a vaccine "may do more harm than good"); *Brox v. Hole*, 590 F. Supp. 3d 359, 366 (D. Mass. 2022), *aff'd in part, vacated in part, remanded*, 83 F.4th 87 (1st Cir. 2023) ("the record suggests that plaintiffs' opposition to receiving the COVID-19 vaccine"—i.e., that God has instilled them with adequate immune systems and a corresponding preference for natural remedies— "is based primarily on philosophical, medical, or scientific beliefs, or personal fears

1   or anxieties rather than bona fide religious practices") (citation and internal quotations

2   omitted); *Mason v. Gen. Brown Cent. Sch. Dist.*, 851 F.2d 47, 51–52 (2d Cir. 1988) (rejecting

3   parents' religious objection to the school's vaccination policy on the grounds that their cited

4   belief in the body's ability to self-heal were scientific and/or secular); *Geerlings v.*

5   *Tredyffrin/Easttown Sch. Dist.*, No. 21-CV-4024, 2021 WL 4399672, at *7 (E.D. Pa. Sept. 27,

6   2021) (rejecting the plaintiff's religious objection to wearing masks as harmful to the body,

7   stating "it takes more than a generalized aversion to harming the body to nudge a practice over

8   the line from medical to religious").

9           Plaintiff does not respond further to Effectual's argument that Moore did not hold a bona

10   fide religious belief.  Instead, Plaintiff incorrectly states: "Effectual's only claim is that Jason

11   Moore was terminated before he informed Effectual of his religious beliefs" and "Defendant

12   admits, for purposes of summary judgment, that Jason Moore has a sincerely held religious belief

13   against taking the Covid 19 vaccination[.]"  (Dkt. No. 31 at 11, 15.)  Review of Effectual's

14   motion for summary judgment quite obviously demonstrates Effectual is contesting the sincerity

15   of Moore's religious beliefs.  The failure to substantively oppose arguments can be construed as

16   a waiver or abandonment of those issues thus warranting dismissal of those claims.  *Jenkins v.*

17   *Cnty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) (finding claims abandoned when not

18   raised in opposition to a motion for summary judgment); *see also Conservation Force v. Salazar*,

19   677 F. Supp. 2d 1203, 1211 (N.D. Cal. 2009) ("Where plaintiffs fail to provide a defense for a

20   claim in opposition, the claim is deemed waived." (citing *Pers. Elec. Transports, Inc. v. Office of*

21   *U.S. Tr.*, 313 Fed. Appx. 51, 52 (9th Cir. 2009))), *aff'd*, 646 F.3d 1240 (9th Cir. 2011).

22           Moore fails to establish a *prima facie* claim that his bona fide or sincerely held religious

23   belief prevented his vaccination.  The reasoning he gave to Effectual about the efficacy and

24

1    trustworthiness of the vaccine are medical beliefs, not religious ones.  *See Fallon*, 877 F.3d at

2    492.  Moore's NJAD and WLAD claims are dismissed.

3              2.   Breach of contract

4          Effectual next argues Moore cannot maintain his breach of contract because he was an at-

5    will employee.  (Dkt. No. 28 at 17–18.)  Effectual argues at-will employees, like Moore, can be

6    discharged at any time for no cause, good cause or even "cause morally wrong" without fear of

7    liability.  (*Id.* at 18.)  Plaintiff responds, arguing Effectual violated its own policy and therefore

8    breached its own contract by failing to allow Moore at least 45 days to apply for his religious

9    accommodation or become vaccinated.  (Dkt. No. 31 at 19) (citing *Thompson v. St. Regis Paper*

10   *Co*, 685 P.2d 1081, 1089 (Wash. 1984)).  Plaintiff also argues his termination was in violation of

11   the public policy against discrimination, which can form the basis for a tort claim for wrongful

12   discharge.  (*Id.* at 19–20.)

13         Under Washington law, an employment contract indefinite as to duration is terminable at

14   will by either the employee or employer.  *Thompson*, 685 P.2d at 1089.  There is no doubt Moore

15   was an at-will employee.  Effectual's handbook, which Moore signed on October 4, 2021, states:

16         Your employment with the Company is at-will. This means that neither you nor the
           Company has entered into a contract regarding the duration of your employment.
17         You are free to terminate your employment with the Company at any time, with or
           without reason. Likewise, the Company has the right to terminate your
18         employment, or otherwise discipline, transfer, or demote you at any time, with or
           without reason, at the discretion of the Company. Nothing in this handbook creates
19         or is intended to create a promise or representation of continued employment.

20   (Dkt. No. 29-3 at 138, 193.)  Additionally, the handbook states: "The policies in this handbook

21   are subject to change at the sole discretion of the Company."  (*Id.* at 139.)  As set forth in

22   *Thomas*, there are exceptions to this "at-will" rule.  Promises of specific treatment in specific

23   situations found in an employee manual or handbook issued by an employer to his or her

24

1    employees may, in appropriate situations, obligate the employer to act in accord with those

2    promises. *Thompson*, 685 P.2d at 1089.  Additionally, an employer can be liable in tort if he or

3    she discharges an employee for a reason that contravenes a clear mandate of public policy.  *Id.*

   *i.   Promises of specific treatment in specific situations*

5          Policies relating to certain procedures the company agrees to use in certain situations can

6    constitute promises capable of breach.  *Wlasiuk v. Whirlpool Corp.*, 914 P.2d 102 (Wash. Ct.

7    App. 1996), *modified,* 932 P.2d 1266 (Wash. Ct. App. 1997).  In *Wlasiuk*, a Washington Court of

8    Appeals analyzed two policies: the first required a human resources investigation before an

9    employee is terminated for gross misconduct, and the second promised an employee with 10 or

10   more years of service would not be involuntarily separated without the approval of two corporate

11   officers.  *Id.* at 174–176.  The court found these promises enforceable and the failure to adhere to

12   those policies could amount to the company's breach of contract.  *Id.* at 176.

13         Unlike *Wlasiuk,* Effectual's Covid-19 policy made no mention of promised procedures to

14   be used prior to termination; nor does the employee handbook.  The Covid-19 policy does

15   discuss the potential for termination but makes no promises in conjunction with that procedure:

16   "Employees, required to vaccinate, who have not complied with this policy by the above

17   deadline may be subject to disciplinary action, up to and including termination of employment."

18   (Dkt. No. 29-4 at 15.)  The Covid-19 policy made no promise to maintain Moore's employment

19   pending the 45-day period in which he was instructed to get vaccinated or submit his request for

20   exemption.

21         And, other than the *Thompson* case giving rise to the claim itself, Plaintiff cites to no

22   other case.  Plaintiff fails to provide precedent evidencing a policy like Effectual's Covid-19

23   policy could create a promise of specific treatment in certain situations as a matter of

24

1   Washington law.  "Arguments made in passing and not supported by citations to the record or to

2   case authority are generally deemed waived."  *United States v. Graf*, 610 F.3d 1148, 1166 (9th

3   Cir. 2010); *United States v. Williamson,* 439 F.3d 1125, 1138 (9th Cir. 2006).  The Court finds

4   Moore's argument that Effectual promised certain treatment in this specific situation unavailing.

5   Moore's claim for breach of contract under this theory is not sustainable as a matter of law.

6                              *ii.   Wrongful discharge violating public policy*

7            Finally, Effectual argues the additional exception to Washington's at-will employment

8   doctrine—the common law tort of wrongful discharge—is not actionable here.  (Dkt. No. 28 at

9   18.)  Effectual argues the public-policy exception generally applies to four established

10  categories: (1) where employees are fired for refusing to commit an illegal act; (2) where

11  employees are fired for performing a public duty or obligation, such as serving jury duty; (3)

12  where employees are fired for exercising a legal right or privilege, such as filing workers'

13  compensation claims; and (4) where employees are fired in retaliation for reporting employer

14  misconduct, i.e., whistleblowing.  (*Id.* at 19) (citing *Martin v. Gonzaga Univ.*, 425 P.3d 837, 843

15  (Wash. 2018)).

16           Plaintiff argues Effectual violated a public policy against "discriminating against

17  employees' religious practices" and identifies Moore's "right to apply for a religious

18  accommodation under Effectual's Covid 19 Policy."  (Dkt. No. 31 at 20.)  Plaintiff argues the

19  public policy against discrimination as set forth in WLAD can form the basis of a tort claim for

20  wrongful discharge.  (*Id.* at 19) (citing *Roberts v. Dudley*, 993 P.2d 901 (Wash. 2000), *as*

21  *amended* (Feb. 22, 2000)).  *Roberts* found an exception to the at-will rule and read a public

22  policy of nondiscrimination from WLAD; importantly, the plaintiff in *Roberts* did not assert a

23  claim *under* WLAD, but rather brought a claim only in the common law, borrowing language

24

1  from WLAD to demonstrate Washington's public policy against discrimination.  993 P.2d at

2  902, 907–911.

3        The purpose of WLAD is certainly a public policy of nondiscrimination.  But it strains

4  credulity to allow Moore to sustain a breach of contract claim under a narrow exception to the

5  "at-will" doctrine based on Effectual's violation of the public policy outlined in WLAD, the

6  statute under which Moore could not sustain a *prima facie* case for discrimination.  To find

7  otherwise would allow plaintiffs to circumvent the express requirements of a statute.

8        Moore's breach of contract arguments are both rejected.  The Court finds Effectual made

9  no promises of specific treatment in specific situations obligating it to act in accord with those

10 promises.  Nor will this Court impose common law liability on Effectual for terminating Moore

11 against the "public policy" as outlined in WLAD, a statute under which Moore has no viable

12 claim.

13                           **IV      CONCLUSION**

14        Accordingly, and having considered Defendant's motion, the briefing of the parties, and

15 the remainder of the record, the Court finds and ORDERS that Defendant's Motion for Summary

16 Judgment is **GRANTED.**  Judgment shall be entered in favor of Defendant.

17        Dated this 13th day of March, 2024.

18

19                                         

20                                         David G. Estudillo
                                           United States District Judge
21

22

23

24